### UNITED STATES

v.

### Chad M. McMILLAN, Sergeant (E–5), U.S. Marine Corps.

### NMCCA 200102219.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 24 Feb. 2001.

Decided 27 Feb. 2004.

LT Robert E. Salyer, JAGC, USNR, Appellate Defense Counsel.

CDR Robert P. Taishoff, JAGC, USN, Appellate Government Counsel.

Before DORMAN, Chief Judge, VILLEMEZ, and HARRIS, Appellate Military Judges.

DORMAN, Chief Judge:

The appellant was tried before a special court-martial composed of officer and enlisted members. Contrary to his pleas, the members convicted the appellant of conspiracy to use methylenedioxymethamphetamine (ecstasy), making a false official statement, the divers use of ecstasy, and wrongfully appropriating 18 rounds of rifle ammunition. The appellant stands convicted of violating Articles 81, 107, 112a, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 907, 912a, and 921. The adjudged and approved sentence includes a bad-conduct discharge, confinement for 120 days, forfeiture of $695.00 pay per month for 4 months, and reduction to pay grade E–1.

This case is before the court upon automatic review under Article 66(b), UCMJ. Although the case was vigorously contested at trial, the appellant has not assigned any errors. We, however, have reviewed the appellant's record of trial, as we are required to do, under Article 66(c), UCMJ. Having done so, we find error that is materially prejudicial to the appellant's substantial rights. Specifically, we find that the evidence is factually insufficient to support the findings of guilt to conspiracy, use of ecstasy, making a false official statement, and a portion of the specification alleging wrongful appropriation. Following our review and our corrective action, we find that there are no remaining errors that are materially prejudicial to sub-

stantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. § 859(a) and 866(c).

### Facts

The appellant first enlisted in the Marine Corps in April 1995, and re-enlisted in November 1998 for 4 years. Prior to the circumstances that gave rise to the appellant's court-martial, he had not been the subject of any disciplinary proceedings. The record supports the conclusion that the appellant was an outstanding young Marine noncommissioned officer. At the beginning of his second enlistment, the appellant was assigned to Marine Corps Recruit Depot (MCRD), Parris Island, SC, where he served as a marksmanship instructor.

Sometime in the spring of 2000, the appellant began living with Corporal Coller in Beaufort, SC. Corporals Kahn and Zook, as well as Sergeant (Sgt) Smith, frequently visited the appellant's house. All these Marines were assigned to the Weapons and Field Training Battalion at MCRD, Parris Island, and all were involved in weapons training. Although it is not clear who owned the house where the appellant and Coller resided, the appellant allowed two females to live in the house and at least one of them, Ms. Savage, paid him rent. These two females shared one of the bedrooms in the house and the appellant slept in the living room on a sofa.

On the weekend of 18–20 August 2000, the appellant and all the above named individuals drove from Beaufort, SC, to Jacksonville, FL. The appellant had been drinking the afternoon and evening of 18 August, and rode in the backseat of Sgt Smith's truck. Coller also rode with the appellant and Smith. The others, as well as some civilian friends, traveled in a separate vehicle.

Prior to their trip, Smith, Zook, Coller, and Kahn discussed purchasing ecstasy once they arrived in Jacksonville. The purchase was to be made from a contact of Sgt Smith; and they had pooled their money to do so. The appellant did not participate in any of these discussions and he did not contribute any money to purchase ecstasy. On the trip down to Jacksonville, there was no discussion of purchasing ecstasy. Furthermore, the appellant fell asleep during the drive.

The weekend of 18 August was the first weekend that the appellant went out of town to go "clubbing" with Coller, Zook, Kahn, and Smith. They had all been to clubs in and around Beaufort, where the appellant reportedly drank heavily. The appellant was coaxed into going with the others that weekend because he had never gone with them before and because he was looking to do something a little different from staying in Beaufort all weekend.

Once they arrived in Jacksonville, they went to the home of one of Sgt Smith's sisters. The appellant was told they were going to meet up with some others and go to a club. Both vehicles were then driven to a parking lot. Once there, Sgt Smith left the area and attempted to purchase ecstasy, but he was unsuccessful. The others waited in the parking lot for a considerable period of time—perhaps 2 hours. The appellant, who continued drinking, fell asleep in one of the vehicles. When Smith returned to the parking lot, he talked to Coller and Kahn. The appellant was sitting inside the truck and was not part of the conversation. Soon thereafter, the appellant left with Smith and Coller for Orlando, arriving there between 0400–0500 on 19 August 2000. Those in the other vehicle drove back to Beaufort.

The appellant spent the day in Orlando with Smith and Coller, visiting with Smith's family and shopping. The appellant also began drinking Saturday morning, and continued to drink during the day. Late in the evening, Smith called his "connection" in Jacksonville to see if he could purchase some ecstasy that evening. Finding that he could, Smith contacted Zook in Beaufort. Zook agreed to meet them back in Jacksonville at Smith's sister's house. Shortly after they all arrived in Jacksonville, an individual named Bobby showed up. Smith, Coller, Zook, and Bobby went into the kitchen of the house and Bobby sold them about 70 ecstasy tablets. Zook was given 30–40 of the pills and Smith and Coller divided the rest. The appellant was not in the kitchen at that time. None of these witnesses testified that they supplied ecstasy to the appellant.

Later that evening, 19 August 2000, they all went to a club in Jacksonville described as a rave club. This was the first time that any of those who testified had seen the appellant at a rave club. Even there, the appellant was drinking, and did not appear to act any differently than he did when he was drinking at clubs in Beaufort. Prior to going to the rave, and again at the rave, the appellant took an over-the-counter product, referred to as "Yellow Jackets," to help him stay awake. From the rave, they all returned to Bobby's house where they spent the night. While at Bobby's house, some of those present used lysergic acid diethylamide (LSD) that was provided by Bobby. Also while at Bobby's, Ms. Savage talked to the appellant, who told her he was feeling weird. Based on the way he was behaving, she believed he had been drugged. When she asked the others why they had drugged the appellant, they just laughed.

On Monday morning, 21 August 2000, the appellant was called down to give a urine sample for what was supposedly a unit sweep—although not everyone in the unit participated. He was also directed to report to the Naval Criminal Investigative Service (NCIS) after he provided his urine sample. When he arrived at NCIS, the appellant sat around waiting for several hours before Special Agent Boscia eventually interviewed him. The interview did not begin until 1620. Although the appellant cooperated in the interview, NCIS did not obtain a written statement from him.

The focus of the NCIS interview was whether the appellant had any knowledge of Marines using illegal drugs. The testimony of the NCIS agent takes up less than 3 pages in the appellant's 617–page record of trial. There is no evidence in the record that the appellant was asked about his own use of drugs, or whether he ever saw anyone in possession of illegal drugs. The agent did testify, however, that the appellant reported having heard a rumor of a Marine who had used illegal drugs and who had given investigators the names of others who had used drugs. Special Agent Boscia also testified that the appellant stated that his two civilian roommates used drugs.

One of these roommates was Ms. Savage, who described the appellant as "anal" about drugs. She testified that the appellant had kicked out her roommate after he caught her using drugs in his house. She also testified that the appellant caught her smoking marijuana in the house and told her that if he caught her using drugs again in his house he was going to kick her out.

After the interview at NCIS, the appellant was asked if he would consent to a search of his quarters. The appellant voluntarily consented. During the search, investigators found: remnants of a marijuana cigarette; rolling papers; a pipe used to smoke marijuana; and 18 rounds of 5.56mm green tipped ammunition. Ms. Savage testified that the remnant, the papers, and the pipe were hers, and that some of the rounds were hers. She testified that her ex-husband had given her some of the rounds. The appellant also testified that some of the rounds were "his." In fact, he had several rounds in his pocket when he went to participate in the urinalysis and to the interview at NCIS because he was called from his duties on the range immediately prior to reporting for the urinalysis.

The Government presented expert testimony of a chemist from the Navy's drug screening laboratory. He testified that the appellant's urine sample tested positive for the metabolite for ecstasy. He also testified that, based on the nanogram concentration in the appellant's urine, he could not rule out the possibility of unknowing ingestion, nor could he say that the appellant would have felt the effects of the ecstasy in his system. Additionally, he testified that ecstasy can dissolve in a liquid and, if consumed that way, one may not be able to smell or taste it. He further testified that those who use ecstasy normally do not use alcohol while doing so because alcohol can lessen the effect of ecstasy.

### Sufficiency of Evidence

The test for legal sufficiency is well known. It requires this court to review the evidence in the light most favorable to the Government. In doing so, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the

evidence is legally sufficient. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987). Without question, with regard to a single use of ecstasy, portions of the false official statement and the wrongful appropriation, that standard is met in this case. However, we find that it was not met with regard to: the charged conspiracy; the divers use of ecstasy; the charged language in the specification under Charge II that "I have never used ecstasy or any other illegal drugs," and that he had "never s[een] anyone in possession of illegal drugs." Charge Sheet.

The test for factual sufficiency, however, is even more favorable to the appellant. It requires this court to be convinced of the appellant's guilt beyond a reasonable doubt, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses. *Turner*, 25 M.J. at 325. Reasonable doubt, however, does not mean the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R.1986). "[T]he factfinders may believe one part of a witness' testimony and disbelieve another." *United States v. Harris*, 8 M.J. 52, 59 (C.M.A.1979). So too may we. In resolving the question of factual sufficiency, we have carefully reviewed the record of trial, but have given no deference to the factual determinations made at the trial level. Based on that review, we are not convinced beyond a reasonable doubt of the appellant's guilt to the charged conspiracy, false official statement, use of ecstasy, and the appellant's wrongful appropriation of "18" rounds of ammunition.

We will briefly state why the Government failed to meet its burden of proof in this case. To begin, we note the opening of the trial counsel's argument on findings in which he said, "[b]irds of a feather flock together." Record at 529. This is a classic case of guilt by association, and the Government's theory of the case with respect to the drug offenses. Clearly, Smith, Zook, Coller, Kahn, and Savage were all very much involved with drugs, and admitted as much from the witness stand. None of them, however, discussed going to Jacksonville to use ecstasy with the appellant. Another theory of the Government's case is that surely the appellant had to know. In order to convict, however, the Government is required to produce evidence of guilt. It failed miserably in meeting its burden in this case.

■ In order to convict the appellant of the offense of conspiracy, the Government was required to prove that the appellant entered into an agreement to use ecstasy, and that while the agreement continued to exist, at least one of the charged overt acts was committed for the purpose of bringing about the use of ecstasy. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), Part IV, ¶ 5b. While true that the agreement need not be expressed with formal words, the evidence must prove that there was a meeting of the minds of the conspirators. We find **no evidence** in this record of trial that the appellant entered into an agreement with any of his alleged co-conspirators to use ecstasy.

■ In order to convict the appellant of the offense of using ecstasy, the Government was required to prove that the appellant used ecstasy and that the use was wrongful. MCM, Part IV, ¶ 37 b(1). The appellant was convicted, however, of the divers use of ecstasy between May and August 2000. Concerning legal sufficiency, we find without equivocation, there is **no evidence** in this record that even suggests that the appellant used ecstasy more than once.

The Government did prove that the appellant used ecstasy one time, but we are not convinced beyond a reasonable doubt that the use was wrongful. First, we find the appellant's testimony to be credible. Second, we are also impressed by the appellant's good military character and clean record. Third, the Government's own expert could not discount the possibility of unknowing ingestion, nor could he say that the appellant would have felt the effects of the drug. Fourth, the Government's expert also testified that ecstasy users do not normally drink alcohol while doing so. This testimony was confirmed by Ms. Savage. The evidence clearly established that the appellant was drinking heavily on the weekend of 18–20 August 2000. These facts raise reasonable

doubt in our minds that the appellant's use of ecstasy was wrongful, primarily because we are not convinced that he knowingly used the drug.

■ In order to convict the appellant of the offense of making a false official statement, the Government was required to prove that the appellant made an official statement, that the statement was false, that the appellant knew the statement was false, and that he made the false statement with the intent to deceive. MCM, Part IV, ¶ 31b. In this case the appellant was convicted of making the following false statements: "I have never used ecstasy or any other illegal drugs," and "I have no knowledge of anyone using or buying any illegal drugs and never saw anyone in possession of illegal drugs." Charge Sheet. With respect to the issue of legal sufficiency, an examination of the testimony of Special Agent Boscia, at pages 348–349 of the record, fails to provide any evidence that the appellant was ever asked about his own use of drugs, or that he said he denied using them.

The record also fails to provide any evidence that the appellant was asked whether he had seen anyone possessing illegal drugs, or that he had denied seeing such possession. Rather, the record reflects that the appellant was asked if he had knowledge of any "Marines" using illegal drugs. He was convicted of the more general language of "anyone." This finding is inconsistent with the evidence, however, because Special Agent Boscia testified that the appellant told him of his two civilian roommates who used drugs, and of a Marine he had heard rumors about. With regard to whether the appellant had knowledge of Marines using or buying illegal drugs, we are not convinced beyond a reasonable doubt that he did. There are simply too many contradictions in this record, within and between the testimonies of Smith, Kahn,

Zook, Coller, and Savage, for this court to guess about the appellant's knowledge. Absent proof beyond a reasonable doubt, we credit his testimony and that of the character witnesses he presented on the merits.

■ In order to convict the appellant of the offense of wrongful appropriation of military property, the Government was required to prove that: the appellant wrongfully took, obtained, or withheld certain military property from the Government; that the property belonged to the Government; that the property had some value; and that the appellant intended to temporarily deprive the Government of the use and benefit of the property. MCM, Part IV, ¶ 46b(2). We assume the Government's theory in this case was one of withholding, as it appears to us that there was no intentional taking in this case. The appellant was a rifle coach and as such handled spare rounds in the normal course of his duties. Even when he went to his interview at NCIS he had a few rounds in his pocket, as he had just come off the range. When his house was searched, more rounds were found. Had the appellant not testified with respect to this specification, we would have found the evidence lacking to convict him of this offense. He testified, however, that some of the rounds were his. We find that very credible. We also find it credible that some of the rounds belonged to Ms. Savage. Some too, could have been brought home by Coller, who also worked on the range, or others who lived in the house. Record at 324. Accordingly, we must affirm the appellant's conviction, but to a number less than 18 rounds. This affirmation is unfortunate, because our experience tells us that this single charge would never have been referred to trial by courts-martial but for the Government's guilt-by-association drug case against the appellant.[1]

1. We note Appellate Exhibits VIII and XI. These exhibits are portions of the records of trial for Corporals Kahn and Coller, respectively. The trial counsel used the exhibits to attempt to refresh the memories of these two Government witnesses, and then to impeach them. The trial counsel also used the exhibits extensively in questioning these two witnesses. The content of the exhibits were never introduced into evidence. In his argument to the members, the trial counsel improperly used some of the information contained in those exhibits. The military judge instructed the members prior to deliberations that they could consider prior inconsistent statements only for purposes of impeachment. We find it doubtful, however, under the circumstances of this case, with the extensive use the trial counsel made of these two appellate exhibits, that the members could have made or followed that fine legal distinction.

## Conclusion

Before setting aside findings in a case in which there has been no assignment of error, we normally would specify issues for appellate counsel to brief. Such action is appropriate because, where the appellant does not assign error, no Government appellate counsel has reviewed the record. We have intentionally decided not to specify issues in this case, because we are confident there is no way the Government could salvage this case. Additionally, the Government failed to meet its burden of proof at the trial level. The unanimity of this decision shouts out that this decision was not a close call.

Accordingly, we dismiss Charges I, II, and III and their supporting specifications. If it were in our power we would also dismiss the Additional Charge and its Specification. The appellant, however, admitted his guilt to this offense, as modified by our action below. Accordingly, we affirm the appellant's conviction to the Specification under the Additional Charge, excepting the word "eighteen" and substituting the word "three," and excepting the language "a value of less than $100.00" and substituting the language "minimal value." Of the excepted word and language, we find the appellant not guilty, and order that word and language dismissed; of the substituted word and language, we find the appellant guilty.

In light of our action on the findings, the sentence is set aside in its entirety and the record is returned to the convening authority who may do one of three things. First, the convening authority can dismiss the remaining Additional Charge and Specification. Second, the convening authority can order a rehearing on sentence. Third, the convening authority can approve a sentence of no punishment. Given the facts of this case, we are compelled to recommend that he follow the first course of action, because justice demands it.

Judge VILLEMEZ and Judge HARRIS concur.